**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **No. 20 CR 211-1** |
| **v.** | ) | **No. 20 CR 211-2** |
| | ) | **No. 20-CR-211-3** |
| **PAUL DELONG,** | ) | |
| **NICHOLAS PANCOSKA, and** | ) | |
| **SEAN MCGUIRE,** | ) | **Judge Jorge Alonso** |
| | ) | |

## <u>Memorandum Opinion and Order</u>

This case stems from a Drug Enforcement Administration ("DEA") drug trafficking

investigation. A grand jury indicted Defendants Paul DeLong and Nicholas Pancoska for various

felonies related to drug trafficking, firearm possession, and money laundering. Co-Defendant

Sean McGuire was also indicted on money laundering charges. DeLong and Pancoska filed a

joint motion under *Franks v. Delaware* challenging the truth of statements contained in affidavits

submitted in support of several search warrants. Pancoska and DeLong also filed motions to

suppress the evidence obtained from those warrants. McGuire filed a motion to sever his case

from the others. For the reasons below, the Court denies the *Franks* motion [109], the motions to

suppress [94] [95] [96] [97] [103] [104], and the motion to sever [101].

## Background

Defendants are charged with the following:

| | |
|---|---|
| Count One | Conspiracy to possess and distribute marijuana in violation of 21 U.S.C. §846 (DeLong and Pancoska) |
| Count Two | Conspiracy to engage in concealment, money laundering in violation of 18 U.S.C. §1956(h) (DeLong and McGuire) |

| Count Three | Engaging in a monetary transaction in property derived from buying and selling marijuana in violation of 18 U.S.C. §§ 1957 and 2 (DeLong and Pancoska) |
| Count Four | Money laundering in violation of 18 U.S.C. §1956(a)(1)(B)(i) and 2 (McGuire) |
| Count Five | Money laundering in violation of 18 U.S.C. §1956(a)(1)(B)(i) and 2 (McGuire) |
| Count Six | Money laundering in violation of 18 U.S.C. §1956(a)(1)(B)(i) and 2 (McGuire) |
| Count Seven | Money laundering in violation of 18 U.S.C. §1956(a)(1)(B)(i) and 2 (McGuire) |
| Count Eight | Money laundering in violation of 18 U.S.C. §1956(a)(1)(B)(i) and 2 (McGuire) |
| Count Nine | Possession with intent to distribute marijuana in violation of 21 U.S.C. §841(a)(1) (DeLong) |
| Count Ten | Possession of a firearm by a convicted felon in violation of 18 U.S.C. §922(g) (DeLong) |
| Count Eleven | Possession of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. §924(c) (DeLong) |
| Count Twelve | Possession of a firearm by a convicted felon in violation of 18 U.S.C. §922(g) (DeLong) |

## I.     Arrest of Timothy Goodwin

On September 21, 2017, DEA agents arrested Timothy Goodwin. After his arrest, agents obtained and executed a search warrant for Goodwin's residence at 16653 W. 135th Street in Lemont, Illinois. The search recovered: (1) approximately one gram of cocaine; (2) a Bersa .380 handgun magazine with six live rounds; (3) a Ruger .380 handgun magazine with 6 live rounds; (4) a box of six live rounds of Winchester ammunition; (5) a black/silver Bersa Thunder .380, semi-automatic handgun; and (6) 2,240 grams (approximately six pounds) of marijuana. Following his arrest, Goodwin spoke with drug enforcement agents. At first, Goodwin denied

2

that the contraband belonged to him and attempted to minimize his criminal activity. After being pressed by agents, however, Goodwin admitted that the contraband was his. The State of Illinois charged him for the six pounds of marijuana and firearms that were found in the residence. He agreed to cooperate with law enforcement in exchange for consideration in his criminal case.

Goodwin told law enforcement that DeLong was his main cannabis supplier and that DeLong distributed roughly 1,000 pounds of cannabis a month. He also told agents that DeLong had a trucking business that he used to ship legal and illegal loads. Goodwin gave law enforcement information about DeLong's associates, including Bruce Liepart and Pancoska. Goodwin typically bought 20 pounds (for $1,800 per pound) from DeLong at a time, except for a one-year period where he bought marijuana from another source. A week before his arrest, Goodwin bought 16 pounds of marijuana from DeLong. Goodwin also told agents that DeLong owned a black Range Rover and silver Tahoe.

On October 11, 2017, Goodwin spoke with the DEA again. He told agents that, following his arrest, he met with DeLong and Pancoska and that Pancoska wanted him to move out of the Lemont home and into an apartment Pancoska owned at 505 N. McClurg Court in Chicago. Pancoska told Goodwin he wanted him to move because police could be watching the Lemont residence and he didn't want anything coming back to him. Goodwin also repeated information that he previously gave to law enforcement, including that DeLong used trucking companies to transport marijuana and that Pancoska owned a legal business, so he only trafficked smaller amounts of marijuana for extra spending money. Goodwin also described his first-hand experiences with DeLong and Pancoska, telling agents that about one year prior he helped DeLong and Pancoska unload roughly 700 pounds of marijuana from a private jet at Palwaukee

airport. He also described another instance where he helped DeLong hide money in a basement wall in DeLong's parents' house.

On November 9, 2017, Goodwin met with law enforcement for a third time. During this interview, Goodwin told agents that DeLong had a warehouse in the South Loop area of Chicago. He then directed agents to 1850 W. Fulton Street in Chicago (which is in the West Loop). Goodwin identified a warehouse that appeared similar to Delong's but stated he couldn't be certain this was the correct address.

## II.     Dog Sniff

Based on Goodwin's statements, DEA agents began surveilling Pancoska and DeLong. In March 2018, agents went to the 505 N McClurg Court address and saw a white Jeep registered to Pancoska in the building's parking area. The building contains public parking on its first two levels, and residential parking on levels three and four. Agents saw Pancoska's Jeep on three separate occasions. On the last occasion, on March 26, 2018, agents got verbal consent from parking garage employees for both the parking garage's public and private floors and, with a canine enforcement unit, conducted an open-air sniff of the Jeep and surrounding area. The canine made a positive alert for the presence of narcotics.

## III.    GPS Tracking

On April 4, 2018, a Will County judge issued an order authorizing the DEA to install and monitor a GPS tracking device on Pancoska's Jeep for 45 days from the date of installation. In support, the DEA submitted an affidavit from DEA Task Force Officer Christopher Marshall, which described the information discussed with a confidential informant (i.e., Goodwin). The affidavit stated that the informant told agents, among other things, that DeLong and Pancoska received approximately 1,000 pounds of marijuana per month that they stored in a warehouse in

the South Loop area of Chicago; that the informant observed DeLong and Pancoska traffic narcotics first-hand; that following his arrest, Pancoska asked the informant to move out of his Lemont residence and into an apartment at 505 N. McClurg Court; and that the informant guided law enforcement to the warehouse's general location, but was unable to identify the specific warehouse that belonged to DeLong and Pancoska. The affidavit further stated that law enforcement conducted physical surveillance at 505 McClurg Court on three occasions where they observed a white Jeep registered to Pancoska parked in the building and that, on one occasion, a canine enforcement unit conducted an open-air sniff of the Jeep that alerted positive to the presence of narcotics.

On June 18, 2018, a Will County judge issued another order authorizing GPS tracking of Pancoska's Jeep for 45 days from the date of installation. An affidavit from agent Marshall was also included, containing the same information from the prior affidavit. In addition, the affidavit described law enforcement's electronic and physical surveillance to date. The affidavit noted that Pancoska travelled to the Lemont address, that this address was the location where agents recovered a large amount of cannabis during a search warrant, and that the informant advised law enforcement that Pancoska owned the property.

A similar search warrant was issued on August 3, 2018. Again, the affidavit in support included all the information from the prior affidavits. It also recapped electronic and physical surveillance information law enforcement had obtained since the last affidavit. A similar order was issued on October 9, 2019. The affidavit in support included all information from and summarized law enforcement surveillance since the last affidavit.

## IV.    Traffic Stops

On April 18, 2018, agents conducted a traffic stop of Richard Pancoska, Nicholas Pancoska's father, after seeing the son exit a building at 345 N. Canal St., drive his Jeep alongside a silver Dodge truck, remove a brown cardboard box from the rear of his Jeep and place it in the truck bed. Believing the box contained narcotics, agents stopped the truck, driven by Richard Pancoska, after the cars departed the area in different directions. During the stop, agents asked Richard if they could search the boxes in the truck's bed. Richard agreed and the agents found truck mirrors and packaging materials in the boxes.

On August 14, 2018, a DEA task force officer watched Pancoska exit a building at 3716 Belmont Ave., enter his Jeep, pull up to the garage door, park and exit the vehicle, and return carrying two white shopping bags that he placed in the Jeep's rear before departing. About 30 minutes later, at the DEA's request, Chicago Police Department officers conducted an investigatory stop of Pancoska. Officers reported that they did not see any white bags in the Jeep. Neither the April nor August stops were included in any affidavits submitted in support of the various search warrants.

## V.    Search Warrants

### A. 2113 West Grand Avenue and 947 West 32nd Street

On October 18, 2018, a Will County judge issued search warrants for 2113 West Grand Avenue (the warehouse) and 947 West 32nd Street ("Chiscapes," the premises for Pancoska's business). In support of these warrants, the government attached an affidavit describing Goodwin's statements to law enforcement, Goodwin's pending criminal case and criminal history, and that he was helping law enforcement in exchange for consideration in his pending criminal case. The affidavit summarized the information Goodwin gave about DeLong and

6

Pancoska's trafficking activities. It also recapped the open-air sniff of Pancoska's Jeep (included in the GPS tracking device affidavits as well), Pancoska's travel to banks and certain addresses, Pancoska's meetings with DeLong and other individuals, and Pancoska's travel to Chiscapes and the Lemont address.

The affidavit also summarized law enforcement's physical surveillance on October 17, 2018, at 2113 West Grand Avenue. The affidavit stated that agents saw Pancoska drive to 2117 W. Grand Avenue, where they watched Daniel Dillon, one of Pancoska's associates, get into his Jeep. Agents saw DeLong's vehicle arrive and enter a garage door at the warehouse's rear. Over the next several hours, agents saw Pancoska, DeLong, and two of their associates enter and exit the warehouse. They also saw, at various times, Pancoska, DeLong and the associates place garbage into cans in the building's rear. No one else approached or placed anything into these garbage cans. Around 8:30 p.m. law enforcement performed a trash pull and found: (1) 25 clear/black open heat-sealed bags with a strong odor of marijuana and marijuana residue; (2) one empty box of 100 count rubber gloves; (3) one pair of used rubber gloves; (4) one large empty box with a shipping label from Hong Kong addresses to "Max Pothoff"; (5) four brown boxes, two were labeled "California Grown, True OG, contains 100 single prerolled of full nugg flower" and the other two were labeled "California Grown, sour diesel, contains: 100 single prerolled full nugg flower"; (6) one white piece of paper rolled up, broken in half, containing a green leafy substance, found in one of the True OG boxes; (7) one empty commercial grade vacuum bag box, 100 count; (8) rubber bands; (9) torn pieces of heat seal bags; and (10) torn sheets of paper with labels stating, "California Grown Sour Diesel". The leafy substance field-tested positive for marijuana.

After the warrant was issued, law enforcement searched the warehouse. As agents searched the warehouse, they found a white Ford van inside. A search of the van recovered: (1) a black hard case with different sizes of ammunition, one Springfield semi-automatic rifle, one Kel-Tec double barrel shotgun, one Palmetto Armory AR-15 assault rifle, one Smith and Wesson AR-15 assault rifle, one FN Herstal semi-automatic handgun, and additional loaded gun magazines, (2) a large amount of cash, (3) three large orange metal boxes, one of which contained 5 large heat-sealed bags, each labeled "California Grown", containing a total of 2,786 grams of marijuana, and (4) registration paperwork for Delong at 15101 Kostner Avenue in Midlothian, Illinois. Searching the rest of the warehouse, agents seized: (1) one Glock handgun, (2) one Sig Sauer 9mm pistol with scope, (3) money order receipts, (4) around 215 grams of marijuana, (5) an "undetermined" amount of cash, (6) two jars containing 953 pills that field-tested positive for MDMA, (7) drug ledgers with large price values and cannabis strain types, (8) large wooden crate with a false bottom, (9) two digital scales, (10) multiple heat sealers and boxes of heat seal bags, (11) several empty gun cases, (12) more loaded gun magazines, (13) packing materials including tape, heat seal bags, garbage bags, and marijuana brand labels, and (14) a shipping label attached to a box addressed to Paul Delong at 420 East Waterside Drive, Unit 1312, Chicago, Illinois.

That same day, agents searched Pancoska's Chiscapes business at 947 W. 32nd Street. Upon arriving, agents explained to Pancoska that he was not under arrest and asked for his consent to search the residence located at 505 N. McClurg Court. The parties dispute whether this consent was voluntary—which is the subject of Pancoska's motion to suppress—but agree that, before the McClurg search, Pancoska called and spoke with Peter Garbis, an attorney. Law enforcement then drove to and searched Pancoska's McClurg residence. While searching the

property, agents located cannabis packaging, heat sealers, scales, cannabis residue, and vapor pens locked in the office.

### B. 15101 Kostner Avenue

The next day, on October 19, 2018, law enforcement obtained a search warrant for 15101 Kostner Avenue in Midlothian, Illinois. The affidavit summarized the warehouse search results. It further stated that Goodwin told law enforcement that 15101 S. Kostner was DeLong's parents' address and that Goodwin once assisted DeLong in hiding over $140,000 behind basement walls in the home. Like the prior affidavits, this affidavit contained a disclaimer about Goodwin's criminal history and other information about his pending lawsuit and agreement to cooperate with law enforcement in exchange for consideration.

### C. 420 E. Waterside Drive

That same day, law enforcement also obtained a search warrant for 420 E. Waterside Drive. The affidavit in support contained all the information provided in the Kostner affidavit. It also described Goodwin's statements to law enforcement that DeLong resided near the area of Upper Wacker Drive and Lake Shore Drive. The affiant represented that this area was close in proximity to 420 E. Waterside Drive. The affidavit further stated that, during the warehouse search, law enforcement found a shipping label addressed to DeLong at 420 E. Waterside Drive. The affidavit also stated that law enforcement went to that address and spoke with a maintenance worker who told agents they were familiar with DeLong and unit 1312, and that they had seen DeLong in the building the previous day. The worker also told law enforcement that they smelled a marijuana odor coming from unit 1312 within the last year.

## Discussion

Defendants DeLong and Pancoska filed a joint motion to quash under *Franks v. Delaware*, arguing that law enforcement's affidavits in support of the various search warrants contain material falsities and omissions that render the probable cause determination invalid. Relatedly, DeLong filed motions to suppress evidence obtained during the searches of the premises at 2113 W. Grand Avenue and 420 E. Waterside Drive. Likewise, Pancoska filed motions to suppress evidence obtained from the dog sniff [94], the GPS vehicle tracking device warrants [95], the search warrant for Chiscapes (947 W. 32nd St.) [96], and the warrantless search of 505 N. McClurg, Unit 3202 [97].[1] Pancoska also filed a motion for a bill of particulars [86]. McGuire filed a motion to sever his case from DeLong and Pancoska's [101].

## I.      Pancoska's Motion for a Bill of Particulars [86].

Pancoska filed a motion for a bill of particulars with respect to counts one and three of the indictment. He argues that the indictment does not provide all the necessary information to determine what evidence is relevant to his charges for the time period alleged in the indictment. Pancoska maintains that, although the Government produced lots of discovery, he shouldn't be required to sift through mountains of evidence to divine the precise evidence relevant to his case. In response, the Government argues that the indictment need only apprise the defendant of the charged offense's elements, the time and place of the accused's conduct, and the citation or statute violated. The Government contends that the indictment does just that, and that it intends to file a *Santiago* proffer before trial, which abates the need for a bill of particulars.

---

[1] Pancoska also filed a motion to suppress the statements made during the search of Chiscapes, the McClurg residence, and during his subsequent interview with law enforcement. [98]. The Court will rule on this motion after a limited evidentiary hearing.

The critical question for a bill of particulars is whether the defendant has been "sufficiently apprised of the charges against him in order to enable adequate trial preparation." *United States v. Vaughn*, 722 F.3d 918, 927 (7th Cir. 2013) (internal quotation marks omitted). A bill of particulars is unnecessary if the indictment "includes each of the elements of the charged offense, the time and place of the accused's allegedly criminal conduct, and a citation to the applicable statute or statutes." *Id.* Also, "a bill of particulars is unnecessary if the information the defendant seeks is readily available through alternate means such as discovery." *Id.*; *see also United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008); *United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003).

Here, the Court finds that a bill of particulars is unnecessary. Pancoska challenges two counts of the indictment: count one charges him with conspiracy to violate 21 U.S.C. §§ 841(a)(1) and 846; and count three charges him with knowingly engaging in a monetary transaction in and affecting interstate commerce in criminally derived property of a value greater than $10,000. *See* [28]. Both counts apprise Pancoska of the charged offense's elements, the time and place of the accused conduct, and cite to the applicable statute. A bill of particulars, therefore, is not necessary. Moreover, the Court agrees with the Government that a bill of particulars should not be used as a discovery device, as it appears to be intended here, and that a *Santiago* proffer, in addition to the Government's prior communications with Defendant's counsel, will adequately advise the Defendants of how the Government intends to prove its case. Accordingly, the Court denies the motion for a bill of particulars.

## II.     McGuire's Motion to Sever [101].

McGuire moves to sever his case from DeLong and Pancoska's under Rule 14 of the Federal Rules of Criminal Procedure. McGuire argues his case has minimal overlap with the

charges levied against DeLong. He argues that the charges against him span four months compared to a 54-month total for the conspiracy charges against DeLong. He also argues that a joint trial risks inviting jury confusion because there are three separate conspiracy charges against the other co-defendants, but none against him, and that limiting instructions will not cure this potential prejudice. He further argues that a jury might unfairly impute the gun and drug trafficking charges onto him even though he has only been charged with money laundering— thus unfairly prejudicing his ability to have an impartial and fair trial.

The Government responds that there is a strong presumption in favor of joint trials, and that severance is particularly inapt in conspiracy cases like this one. It further argues that a single trial would avoid duplicative efforts, repetitive testimony, risk to cooperating witnesses testifying, and would not randomly favor the last-tried defendant. The Government disagrees that a joint trial presents a risk of unfair prejudice or that jury confusion cannot be alleviated by a properly instructed jury.

The law prefers trying co-defendants together, especially when co-conspirators are indicted together. *United States v. Jett*, 908 F.3d 252, 276 (7th Cir. 2018); *see also United States v. Morales*, 655 F.3d 608, 624 (7th Cir. 2011). "[J]udicial economy, consistency of verdicts, and systematic efficiency" inform this preference. *Morales*, 655 F.3d at 624–25. Courts have discretion to order separate trials of properly joined co-conspirators if joinder appears to prejudice a defendant, but "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Morales*, 655 F.3d at 625 (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). Even if a defendant shows prejudice, "Rule 14 does not require severance";

instead, the rule "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id.* (quoting *Zafiro*, 506 U.S. at 538-39).

In this case, the Court denies McGuire's motion to sever. The Court finds that McGuire has not demonstrated a sufficient level of prejudice to warrant severance. First, a properly instructed jury will alleviate any concerns related to confusion about the different conspiracy counts. Second, the Defendants were indicted together and are charged with participating in the same series of acts and transactions. Judicial economy and efficiency interests, therefore, are best served by a joint trial. In short, any risk of prejudice to McGuire is too slight when weighed against the problems created by separate trials, and any other issues can be alleviated by a properly instructed jury.

## III. Defendants' Motion to Quash under *Franks v. Delaware* [109].

The Fourth Amendment states that "no warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "Probable cause for issuance of a search warrant exists if there is 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Bacon*, 991 F.3d 835, 839-40 (7th Cir. 2021) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). If law enforcement seizes evidence without probable cause, then, absent an exception, it should be excluded, under what is known as the exclusionary rule. *Herring v. United States*, 555 U.S. 135, 129 S. Ct. 695, 700 (2009). Because the ability of a judge to determine probable cause depends on the accuracy of the police's submissions, "a search warrant is invalid if the police obtain it by deliberately or recklessly presenting false, material information to the issuing judge." *Bacon*, 991 F.3d at 841.

The Supreme Court held in *Franks v. Delaware* that a defendant may challenge the truth of statements made in an affidavit seeking a search warrant. 438 U.S. 154, 171 (1978). To obtain

13

an evidentiary hearing on the truth of the information submitted in support of a search warrant (also known as a "*Franks* hearing"), a defendant must make a "substantial preliminary showing of (1) a material falsity or omission that would alter the probable cause determination, and (2) a deliberate or reckless disregard for the truth." *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014). In addition to these requirements, the defendant must also show that, absent the false statements or omissions, probable cause would have been absent. *United States v. Santiago*, 905 F.3d 1013, 1025 (7th Cir. 2018) (quoting *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013)). "[I]f probable cause to issue the warrant would still exist even if the false statement or material omission were corrected, then no *Franks* hearing is required." *Id*. (quoting *United States v. Carmel*, 548 F.3d 571, 577 (7th Cir. 2008)). "*Franks* hearings are 'rarely held' because '[t]hese elements are hard to prove.'" *United States v. Dessart*, 823 F.3d 395, 402 (7th Cir. 2016) (quoting United *States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000)).

Defendants DeLong and Pancoska jointly move to quash the various search warrants issued by the Twelfth Judicial Circuit in Will County, Illinois. Defendants contend that these warrants violate the principles set forth in *Franks* because these warrants relied on information that was knowingly and intentionally false and, furthermore, because agents omitted material information that would've shown that Goodwin was not a credible cooperating witness. The Government, for its part, argues that Goodwin's statements were not false or inaccurate, that agents did not knowingly or recklessly mislead the judges, that the omissions from the law enforcement affiant's affidavit were not material, and that the good faith exception to the exclusionary rule applies here.

### A. Omissions

Defendants identify several statements they contend are misrepresentations or omissions. With respect to omissions, Defendants argue that the Government omitted the following material information: (1) Goodwin's statements to task force agent Marshall regarding the narcotics and firearm found in his home; (2) the extent of Goodwin's drug trafficking history; (3) the nature of his prior conviction; (4) the length of his prior prison sentence (5) the fact that narcotics, a firearm, and over 100 rounds of ammunition were recovered from Goodwin's home on September 21, 2017, pursuant to a search warrant; (6) the fact that Goodwin admitted to owning two firearms despite being a convicted felon; (7) the fact that Goodwin was a subject and/or witness in a homicide investigation,; (8) the fact that Goodwin had previously been a confidential informant for law enforcement; (9) the fact that Goodwin provided information, including a third-party admission by his friend Esteban "Steven" Rodriguez to participation in the homicide victim's death, to law enforcement during an interview at his attorneys' office in August 2017; (10) the fact that a videotaped recording existed of Goodwin's interview by TFO Marshall; and (11) the results of the traffic stops of Richard Pancoska and Nicholas Pancoska.

The Court finds that Defendants have not made the necessary showing for a *Franks* hearing. First, Goodwin's initial statements about denying responsibility for the narcotics and firearms are not material to the probable cause determination. It is hardly surprising that an individual under investigation would try to downplay his own involvement in criminal activity. Goodwin, however, eventually confessed and took responsibility for the narcotics and firearms. The Court finds that omitting these prior efforts to minimize Goodwin's criminal activity does not negate his credibility given that, in the same interview, he took responsibility for this conduct, provided information based on his own first-hand involvement, and provided

information that was against his penal interest. *See, e.g.*, *United States v. Harris*, 403 U.S. 573, 583 (1971) ("Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search").

Second, with respect to Goodwin's prior criminal history, the Seventh Circuit recognizes that a *Franks* hearing is not required every time some substantial adverse information about an informant's credibility is omitted from a probable cause affidavit. *United States v. Clark*, 935 F.3d 558, 565 (7th Cir. 2019). A detailed description of Goodwin's prior narcotics trafficking, prison sentence, witnessing another crime involving a death, prior cooperation with law enforcement, or any similar information was not necessary or critical to a judge's probable cause determination. Nor is the Court convinced that a review of the videotaped portions of Goodwin's interview would have changed the probable cause determination. Although the Will County judges might have had the opportunity to review Goodwin's manner in response to law enforcements' questions, that is merely one factor to consider. What's more, given that the Court does not find any of the omissions material, the Court is not persuaded that a review of these videotapes would have altered the outcomes.

Moreover, law enforcement included information that advised the judge that Goodwin had a pending criminal matter, that he was receiving consideration in exchange for his cooperation with law enforcement, and that he had prior convictions. The Will County judges, therefore, had sufficient information about Goodwin's prior criminal history and motivations to cooperate with law enforcement to assess his credibility.

Third, with respect to the traffic stops, the Court does not find these omissions to be material nor of the kind that negate a probable cause finding —much less that law enforcement

16

intentionally or recklessly omitted this information. Even if this information had been included, law enforcement possessed sufficient evidence of probable cause to justify issuing the warrants.

### B. Falsities

Defendants identify the following as false statements included in law enforcement's affidavits: that DeLong resided at 505 N. McClurg Court; that Pancoska owned the Lemont home where law enforcement recovered a significant amount of narcotics when Goodwin was arrested—implying that agents discovered Pancoska's stash house; and that Goodwin told law enforcement that Defendants' warehouse was in the South Loop, not in the West Loop where law enforcement eventually searched.

The Court finds that none of these statements were necessary to a finding of probable cause or that law enforcement intentionally or recklessly included these statements. First, regarding the warehouse location, this was not an intentional or reckless misstatement. To be sure, Goodwin told law enforcement that the warehouse was located in the South Loop. But when he led law enforcement to where he thought the warehouse was, he led them to the West Loop neighborhood—approximately two blocks from the warehouse that law enforcement eventually searched based on their physical surveillance. At best, Goodwin's statement shows his unfamiliarity with Chicago neighborhoods. Goodwin acknowledged that he couldn't be sure that the building he identified was the correct warehouse, which was included in the affidavit. Instead, law enforcement corroborated Goodwin's information about a warehouse and its general location with their own physical observations.

Second, as for the other statements Defendants identify, the Court finds that these statements, even if false, were not material to the probable cause determination. With respect to the statement that DeLong resided at 505 N. McClurg, this is the address Goodwin identified as

associated with DeLong. Law enforcement also observed DeLong at the residence from time to time, albeit for brief periods. In any event, the search warrants related to other properties, so this statement was not material to a probable cause finding for any of those properties. Defendants do not demonstrate how the probable cause calculus would have been different if this statement had been corrected. Moreover, the affidavits describe another conversation between Goodwin and Pancoska where Pancoska told Goodwin he wanted him to move into an apartment he owned at 505 N. McClurg Court—the clear inference from which is that Pancoska owns that apartment. The Will County judges, therefore, had sufficient information to make that distinction.

Similarly, the Court does not find the other statement identified by Defendants to be material. Defendant takes issue with the statement that a large quantity of narcotics was recovered from the Lemont address that Pancoska owns. Defendants argue that this statement implies that Pancoska owned the Lemont home and that agents discovered Pancoska's stash house—but this argument overstates this statement's inferences. The affidavits do not imply that agents identified Pancoska's stash house—indeed, they state elsewhere that Pancoska and DeLong stored their narcotics in a different place altogether. Thus, though the affidavit implies that Pancoska owned the Lemont property, it does not imply that law enforcement discovered Pancoska's stash house as Defendant argues. Moreover, the statement that Pancoska owned the property was consistent with what Goodwin told law enforcement. Furthermore, the affidavits state the Pancoska supplied the informant (i.e., Goodwin) with the cannabis, implying that the cannabis found at the address belonged to the informant. But, even if the statement that Pancoska owned the property was inaccurate, the affidavits contained enough other evidence to establish probable cause for the various search warrants. To wit, these affidavits detail the other statements Goodwin made about Pancoska and DeLong's operation and the surveillance and evidence

recovered from the trash pull at the 2113 W. Grand Ave. warehouse. In short, the Court does not find this statement material to the probable cause finding.

### C. Probable Cause

Defendants must also show that even if the misstatements were corrected and the omitted information included, that the probable cause finding would have changed. *Santiago*, 905 F.3d at 1025. The Court finds that Defendants fail to carry that burden. Unlike in the cases cited by Defendants, Goodwin's statements were corroborated by law enforcement's physical surveillance. For instance, law enforcement saw Defendants entering and exiting the back of the warehouse located at 2113 W. Grand Ave. and putting trash into the garbage. Defendants and Bruce Leipart (an associate) were the only individuals who placed trash into the garbage while law enforcement conducted their surveillance. Law enforcement already knew, based on Goodwin's statements, that Defendants operated their trafficking activities out of a warehouse in the same area of town. And after law enforcement performed the trash pull, they found heat-sealed bags containing residue that field tested positive for marijuana; vacuum bags, rubber bands, and rubber gloves; two boxes labeled "California Grown, True OG, contains 100 single prerolled of full nugg flower" and two boxes labeled "California Grown, sour diesel, contains: 100 single prerolled full nugg flower", and torn sheets of paper with labels stating, "California Grown Sour Diesel." This evidence, when combined with Goodwin's statements about DeLong and Pancoska running a high-volume narcotics operation, gave agents enough evidence to support a probable cause finding for the warehouse and residence search warrants.

### D. Good Faith Exception

Lastly, the Government appeals to the good-faith warrant exception. "An officer's decision to obtain a warrant is prima facie evidence that he or she was acting in good faith."

*United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002). A defendant may rebut this *prima facie* case by presenting evidence showing either that: (1) the warrant-issuing officer "wholly abandoned his judicial role" and failed to "perform his neutral and detached function," serving "merely as a rubber stamp for the police"; or (2) the affidavit submitted in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. 897, 914 (1984) (internal quotation marks omitted). Defendants do not argue that the judge issuing the warrants abandoned his neutral and detached function. Thus, the Court focuses on the second element.

As discussed above, the Court does not find that the affidavit submitted in support was so lacking in indicia of probable cause that law enforcement could not have reasonably relied on the information contained within it. Again, the statements given by Goodwin along with law enforcement's physical surveillance were sufficient to establish probable cause for the search warrants that were issued for the various properties. Accordingly, the Court also finds that the good-faith exception applies.

## IV. Pancoska's Motions to Suppress [94] [95] [96] [97].

Next, the Court turns to Pancoska's motions to suppress the evidence from the dog sniff, the GPS vehicle tracking device warrants, the search warrant for Chiscapes, and the warrantless search of 505 N. McClurg, Unit 3202 (Pancoska's residence). The Government argues that it does not intend on introducing any evidence obtained from the GPS tracking devices, the searches of Chiscapes or Pancoska's residence, or the dog sniff. It argues, therefore, that the motions to suppress with respect to those events are moot. The Government also argues, in the *Franks* briefing, that the searches of the warehouse and DeLong's residence were sufficiently attenuated from the other searches. Defendants disagree, arguing that the warehouse and

20

subsequent search warrants relied on fruits of the poisonous tree obtained from illegal warrants and that attenuation does not apply.

The attenuation doctrine is an exception to the exclusionary rule that allows a court to deny a motion to suppress where the causal link between the constitutional violation and evidence obtained is remote or where suppression would not serve the interests protected by the constitutional guarantee. *United States v. Street*, 917 F.3d 586, 593 (7th Cir. 2019). In other words, this exception applies in situations where "the connection between the illegal conduct and the subsequent discovery of evidence becomes so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *United States v. Conrad*, 673 F.3d 728, 732 (7th Cir. 2012) (internal quotation marks omitted). To determine whether attenuation applies, the Court considers" "(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.'" *United States v. Ramos-Guerro*, Case No. 13-CR-464, 2016 WL 3067801, at *6 (N.D. Ill. 2016) (citing *United States v. Ienco*, 182 F.3d 517, 526 (7th Cir. 1999)).

**A. Lapse of time**

The Court finds that this factor weights in favor of attenuation. To start, the dog sniff occurred several months before the search warrants for the warehouse and residence were obtained and executed. Even if the dog sniff were improper, the length of time between when it occurred and when agents searched the warehouse favors attenuation.

Similarly, the Court finds that the temporal factor weights in favor of attenuation as it relates to the GPS tracking data. Although this data was obtained continuously over the course of several months, it was merely used on October 17, 2018 to locate Defendants so that agents could conduct physical surveillance. Thus, the Court agrees with the Government that *United*

*States v. Martin*, 712 F.3d 1080 (7th Cir. 2013), controls the GPS tracking data aspect of this case in that the data appears to have simply aided law enforcement in tracking down Defendants on the day that law enforcement saw them at the warehouse. After that, law enforcement's physical surveillance, in conjunction with Goodwin's prior statements and the trash pull, established the necessary link between the Defendants and the alleged illegal activity. Law enforcement did not, unlike in *United States v. Jones*, 565 U.S. 400 (2012), cited by Defendants, rely on the GPS data to establish the necessary link between the Defendants and the alleged illegal activity.

### B. Intervening Circumstances

With respect to intervening circumstances, this factor looks to whether any intervening circumstances occurred that may have severed the causal connection between the violation and the discovery of the evidence. *Conrad*, 673 F.3d at 734. This is a highly fact-intensive inquiry precluding "sweeping generalizations about the circumstances that will be relevant for any particular case." *Id.*

The Court finds that this factor favors attenuation too. Although the dog sniff may have added additional evidence supporting a finding of probable cause, the Court finds, as stated above, that there was sufficient evidence aside from the dog sniff to support a finding of probable cause for those search warrants. For instance, law enforcement's physical observations and the trash pull corroborated Goodwin's statements. Thus, even without the positive canine alert, law enforcement had sufficient evidence to support a finding of probable cause for the search warrants for DeLong's warehouse and residence.

As for the GPS tracking data, again this information merely assisted officers with locating Pancoska on the day that agents surveilled the warehouse. Aside from that, the Court

finds that the GPS data merely provided background on law enforcement's investigation, but that Goodwin's statements as well as agent's physical surveillance and the trash pull provided enough evidence for a probable cause finding.

### C. Flagrancy of misconduct

Lastly, the Court considers the flagrancy of the misconduct. This final factor is the most important because it is tied directly to the primary goal of the exclusionary rule: deterrence of police misconduct. *Conrad*, 673 F.3d at 735. This factor considers both the before and after conduct related to the alleged constitutional violation. *Id.*

This factor strongly favors attention. Agents obtained search warrants before each of the alleged constitutionally deficient search warrants, demonstrating a conscious regard for Defendants' constitutional rights. The goal of deterring police misconduct would not be furthered here since agents obtained search warrants before executing these searches. Accordingly, the Court finds that the balance of factors favors an attenuation finding between the dog sniff and GPS tracking warrants and the later search warrants. For those reasons, Pancoska's motions [94] [95] [96] [97] are denied.

## V.    DeLong's Motions to Suppress [103] [104].

Next, the Court considers DeLong's motions to suppress the evidence from the search warrants for 2113 W. Grand Ave and 420 E. Waterside Drive. Making similar arguments to those in the *Franks* motion, DeLong argues that the search warrants lacked probable cause because they relied on Goodwin's false information and omitted material information, and because law enforcement did not have other sufficient evidence to support a finding of probable cause. DeLong further argues, with respect to the warehouse warrant, that the time that elapsed between Goodwin's statements and the court's order did not support a finding of probable cause,

that agents never set up a controlled buy despite Goodwin's offer to do so, that the trash pull was inconclusive, and that Goodwin did not testify in person before the judge. With respect to the residence warrant, DeLong also argues that the anonymous tip from the maintenance worker was insufficient, that the warrant only relied on a single day of surveillance at the warehouse, and that the shipping label found at the warehouse was insufficient to establish probable cause to search his residence.

Probable cause requires more than mere suspicion, but less than certainty. *United States v. Ellery*, 678 F.2d 674, 677 (7th Cir. 1982). When assessing probable cause based on an informant's tip, courts employ a totality-of-the-circumstances approach looking at: (1) the degree of police corroboration; (2) the informant's firsthand knowledge; (3) the detail provided; (4) the time between the reported events and the warrant application; and (5) whether the informant appeared before the judge. *United States v. Johnson*, 655 F.3d 594, 600 (7th Cir. 2011). As explained below, the Court finds that both warrants were supported by probable cause.

### A. Warehouse Warrant

For this warrant, several factors support a finding of probable cause. The first are Goodwin's statements that DeLong and Pancoska operated their drug activities from a warehouse in the same area of the city. In fact, Goodwin led officers to a location that was less than two blocks from the actual warehouse. At a minimum, law enforcement was put on notice that DeLong and Pancoska may have had a warehouse in the West Loop that they operated drug activities out of. Agents corroborated this information by watching DeLong, Pancoska, and their associates enter and exit the warehouse located at 2113 W. Grand Ave.

Goodwin also gave first-hand accounts of DeLong and Pancoska's drug activities—describing events that he participated in. The fact that law enforcement never set up a controlled

buy does not mean that they lacked evidence sufficient to support a finding of probable cause. *See, e.g.*, *United States v. Jones*, 208 F.3d 603, 608 (7th Cir. 2000). Moreover, the information Goodwin gave was specific and detailed. And though Goodwin gave this information over the course of a few interviews that occurred roughly one year before the search, he described a large-scale and ongoing narcotics operation indicating a reasonable likelihood that these activities were still occurring, especially considering the evidence law enforcement recovered from the trash pull. *See United States v. Spry*, 190 F.3d 829, 836 (7th Cir. 1999) ("Passage of time is less critical when the affidavit refers to facts that indicate ongoing continuous criminal activity"). Likewise, although Goodwin was not presented to the judges during the warrant procedure, the Court attributes little weight to this factor in light of the other factors that the Court finds more substantial.

In addition to Goodwin's statements, law enforcement performed a trash pull where they found evidence indicating significant drug activities. Defendants compare this case to *United States v. Abernathy*, a Sixth Circuit case where the court found that a single trash pull of garbage cans outside the defendant's residence was not enough, standing alone, to establish probable cause to search the residence. 843 F.3d 243 (6th Cir. 2016). But *Abernathy* is distinguishable. To start, unlike in *Abernathy*, this case contains additional evidence beyond just a single trash pull. It contains Goodwin's specific statements about DeLong and Pancoska's drug operations. Indeed, the absence of additional evidence was a key point the *Abernathy* court relied on in reaching its holding that probable cause was lacking. *Id.* at 254.

Also, *Abernathy* recognized that a single trash pull might be enough to establish probable cause for a search warrant if police recover a large quantity of drug waste indicating ongoing drug activity. *Id.* at 255. That is precisely the case here. Agents suspected that DeLong and

Pancoska were involved in high-volume narcotics operations based on Goodwin's information, and the items recovered from the trash pull corroborated those suspicions. Law enforcement, therefore, had enough information to believe that this warehouse contained evidence of narcotics trafficking.

### B. Residence Warrant

With respect to DeLong's residence at 420 E. Waterside Drive, the Court finds that probable cause also supported issuance of this warrant. For starters, the same information regarding Goodwin's statements, law enforcement's physical observations, and the trash pull for the warehouse all informed law enforcement's evaluation about whether evidence of criminal activity might be found at DeLong's residence. Moreover, during the warehouse search, law enforcement found a shipping label addressed to DeLong at the Waterside address. To be sure, this label was seven months old. But again, given the information indicating that these drug activities were ongoing, the Court attributes little weight to the age of this information. The same applies to Defendants' argument that the warrant was issued long after Goodwin's statements. Although it was nearly a year between the warrant and Goodwin's interviews, the Court attributes little weight to that factor since the evidence demonstrates ongoing and high-volume narcotics activities.

What's more, the probable cause finding was bolstered by a statement from a maintenance worker that they were familiar with DeLong, that they had seen DeLong at the building a day prior, and that they smelled marijuana coming from DeLong's unit on multiple occasions. Thus, law enforcement's suspicions were further corroborated that evidence of criminal activity likely would be found inside the residence. Also, law enforcement provided evidence, through the agent's training and experience, that drug dealers are likely to keep

evidence of illicit activities where they live. The judge was entitled to rely on the agent's experience on that matter. *See United States v. Lamon*, 930 F.2d 1183, 1189 (7th Cir. 1991).

Lastly, the Government argues that the good-faith exception should apply to both the warehouse and residence warrants. The Court agrees. The Defendants do not argue that the judge issuing the warrants abandoned his neutral and detached role. And, for the reasons set out above, the Court finds that the warrants were not so lacking in indicia of probable cause that law enforcement's belief in the existence of probable cause was unreasonable. As such, the Court denies the motions to suppress [103][104].

## Conclusion

For the reasons above, the Court denies Pancoska's motion for a bill of particulars [86], McGuire's motion to sever [101], DeLong's motions to quash [103][104], DeLong and Pancoska's motion to quash under *Franks v. Delaware* [109], and Pancoska's motions to suppress [94] [95] [96] [97].

**SO ORDERED.**                                        **ENTERED:   March 18, 2022**

**JORGE L. ALONSO**
**United States District Judge**